This timely appeal comes for consideration upon the record in the trial court and the parties' briefs. Defendant- Appellant, Tommy Lee Brown (hereinafter "Brown"), appeals the trial court's decision finding him guilty of disorderly conduct, assault, and resisting arrest and sentenced him to 180 days in jail for the assault charge, 90 days in jail for resisting arrest, and 30 days in jail for Brown's disorderly conduct and ordered these terms be run concurrently. The issue before us is whether Brown's conviction is against the manifest weight of the evidence. Because we conclude Brown's conviction was not a manifest miscarriage of justice necessitating a new trial, we affirm the trial court's decision.
On July 17, 1998, Youngstown Police Officer Milton Eskew (hereinafter "Eskew") was working off-duty as a security officer at C. Staples, an eating establishment in Youngstown, Ohio. On that day, two men, Brown and his friend, Lanzell Crum (hereinafter "Crum"), entered C. Staples sometime between 1:00 and 1:30 a.m. When they entered the restaurant, they were the only customers present. Both men had been drinking before they arrived. Crum testified he had consumed three or four 40 ounce beers and some wine and was drunk. Brown testified he had consumed two 24 ounce beers and some wine. Crum ordered food at the counter while Brown played a video game.
After Brown finished the video game, he approached the counter and said some things about a female employee of C. Staples which Eskew found offensive. Eskew then asked Brown to leave. Some of the employees informed Brown that Eskew was a police officer. After initially refusing to leave, Brown exited the building. Eskew then called 911 and informed them of the disorderly conduct. There was conflicting evidence at trial as to what happened next. However, there is no dispute that Brown and Eskew began to fight until the police arrived and arrested Brown.
At Brown's preliminary hearing on August 11, 1998, the matter was set for trial on September 2, 1998. After numerous continuances, the matter was tried to the bench on January 20, 1999. Crum's deposition had previously been taken because he was unavailable at the time of trial. That deposition was admitted into evidence without objection.
After taking the matter under advisement, on February 25, 1999, the court found Brown guilty on all counts and, on May 14, 1999, sentenced him to 180 days in jail for the assault charge, 90 days in jail for resisting arrest, and 30 days in jail for Brown's disorderly conduct and ordered these terms be run concurrently. Brown's sentence was then stayed pending appeal.
Brown's sole assignment of error argues:
 "The trial court errored [sic] when it convicted the defendant and the conviction was against the manifest weight of the evidence."
Because we find Brown's conviction was not a manifest miscarriage of justice, we affirm the trial court's decision.
Brown argues his conviction was against the manifest weight of the evidence. When reviewing a manifest weight claim, this court's role is to examine whether the evidence produced at trial "attains the high degree of probative force and certainty required of a criminal conviction."State v. Getsy (1998), 84 Ohio St.3d 180, 193, 702 N.E.2d 866. To do this, a reviewing court must sit as the "thirteenth juror" and examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the jury "`clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" Statev. Thompkins (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541, quotingState v. Martin (1983) 20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717. "`The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" Id. at 387, 678 N.E.2d at 547 quoting Martin, supra at 175, 20 OBR at 219, 485 N.E.2d at 720.
Brown was convicted on three counts: 1) disorderly conduct in violation of R.C. 2917.11(A)(1); 2) assault in violation of R.C. 2903.13(A); and, 3) resisting arrest in violation of R.C. 2921.33(A). R.C. 2917.11(A)(1) provides as follows: "No person shall recklessly cause inconvenience, annoyance, or alarm to another by * * * [e]ngaging in fighting, in threatening harm to persons or property, or in violent or turbulent behavior." R.C. 2903.13(A) provides as follows: "No person shall knowingly cause or attempt to cause physical harm to another or to another's unborn." R.C. 2921.33(A) provides as follows: "No person, recklessly or by force, shall resist or interfere with a lawful arrest of the person or another."
In the present case, Eskew testified that after Brown finished playing the video game he began to say he was "tired of this MF" and he "should tear this MF place up." Tr. p. 7. Eskew stated Brown did not say "MF", but rather used the "full version" of the term. Id. Eskew did not say anything to Brown about his behavior until Brown stated one of the women working at C. Staples was a "bitch'n whore." Tr. p. 8. At that point Eskew asked Brown to leave. He testified Brown answered, "I don't have to do a MF thing * * * I am not going no mother fucking where." Tr. p. 8. Eskew then told Brown that if he was still there when the police got there, then he would be arrested. Tr. p. 9. Brown walked out the door, but then came back in stating, "No one fronts me," and pushed Eskew so hard he fell backward and his gun came out of his holster. Tr. pp. 9-10. As Eskew bent down to pick up the gun, Brown rushed him again. Tr. p. 10. The two began to fight and Eskew dropped the gun a second time. Tr. pp. 10-11. Crum picked up the gun, but put it down after Eskew ordered him to do so. Tr. p. 11. Eskew then wrestled Brown to the ground, told him he was under arrest, and held him there until the police came. Tr. p. 12. Brown had been hitting Eskew with his fist during the fight. Tr. pp. 12-13.
Eskew's testimony was supported by that of Maceba Williams (hereinafter "Williams"), the woman Eskew claimed Brown insulted. She stated that after Brown finished playing the video game, he and Eskew had a short conversation. Then she stated Brown told Eskew "Don't tell me what to do and get out of my face." Tr. p. 32. She then testified Eskew told Brown he better leave before he called the police. Tr. p. 32. Brown then left and Eskew called the police. Tr. p. 33. As Eskew was on the phone, Brown was hitting Eskew with the door and, once Eskew got off the phone, Brown came back inside the restaurant and pushed Eskew, making Eskew slip and lose the gun from his holster. Tr. pp. 33-35, 41. She told Brown not to push Eskew because he was a real police officer. Tr. p. 40. Then Brown and Eskew began to fight. Tr. p. 34. Crum picked the gun off the floor and Eskew told him to put it down, which he did. Tr. pp. 34, 36. Brown and Eskew then took the fight outside until the police arrived and arrested Brown. Tr. p. 37.
A third witness, the owner of C. Staples, Emma Young (hereinafter "Young"), also was present that night and her testimony supports Eskew's version of events. She was working in the kitchen that night when she heard Crum and Brown enter. Tr. p. 44. She heard one of the men "carrying on something terrible." Tr. p. 45. She testified Eskew asked the man to be quiet and that he was going to call the police. Tr. p. 45. She came out of the kitchen and saw the man hitting Eskew with the door while Eskew was on the phone. Tr. pp. 45-46. Then she saw Eskew and Brown pushing each other until they began to fight. Tr. p. 46. The two hit the ground and Eskew held Brown there until the police arrived. Tr. p. 48. She also heard Eskew tell Brown to calm down or be arrested. Tr. p. 48.
Brown testified that he and Crum entered C. Staples that night because they knew someone who worked there. Tr. p. 60. Brown had been drinking before he entered C. Staples. He had consumed two 24 ounce cans of beer and some wine. Tr. p. 66. Crum ordered food and Brown played a video game. Tr. p. 60. After he finished playing the video game, he went over to Williams and Crum to talk to them. Tr. p. 61. He did admit he may have called Williams some things people might have taken offense to. Tr. p. 67. Specifically, he states he may have mentioned Crum would not want to "get with her * * * because such and such had F-ed her" and said she was a "hoe". Tr. p. 62. At this point, Eskew asked Brown to leave. Tr. pp. 62, 68. Brown told Eskew, "I don't feel I have to leave," but ended up leaving the building anyway. Tr. pp. 62-63. As Brown was leaving with Crum, he listened in on Eskew's conversation on the telephone through the door. Tr. p. 63-64. After Eskew got off the phone "he opened the door and rushed out at [Brown]" and hit him on the head with his gun. Tr. pp. 64, 71. The two then fought and Eskew held him down until the police arrived. Tr. p. 64. Brown states he never re-entered the building and did not instigate the fight between he and Eskew. Tr. pp. 64-65.
In his deposition testimony, which was admitted into evidence without objection, Crum gives an alternate account of Brown's version of events. Crum testified he had consumed three or four 40 ounce beers and some wine before entering C. Staples and he was kind of drunk, but that Brown hadn't drunk much of anything. Dep. pp. 26-28, 31. He testified that after he and Brown entered C. Staples he placed an order. Dep. p. 7. He did not remember where Brown was. Dep. p. 10. He then saw Brown and the officer arguing, but he did not know what they were arguing about. Dep. p. 11. Crum said he told Brown, "Come on, man, let's go. It ain't worth it. Forget all this." Dep. p. 12. So he pulled Brown out the front door. Dep. p. 14. Eskew followed, charged at Brown, and the two began to wrestle and Eskew hit Brown with something on the head. Dep. p. 16. Then somebody called the police. Dep. pp. 17-18. He stated that there was no further exchange between Brown and Eskew after Brown left the building until Eskew came running full speed out the door and tackled Brown. Dep. pp. 18, 36-37. In his opinion, Eskew started the fight. Dep. p. 21. He did not recall seeing Eskew's gun at any time. Dep. p. 40.
In light of this testimony, Brown's conviction for assault was not against the manifest weight of the evidence. Eskew, Williams, and Young all testified Brown left the building, re-entered and began to push Eskew until the two began to fight. Although Brown and Crum testify to the contrary, it was reasonable for the trier of fact to conclude their version of events is less reliable for a variety of reasons, the least of which is that the two had been drinking that evening prior to visiting C. Staples and Crum admitted he was drunk when the two were there. All the witnesses testified Brown pushed and punched Eskew. Therefore, he could be convicted for knowingly causing physical harm to another.
The same is true for Brown's conviction for disorderly conduct. It is clear he knew he caused inconvenience or annoyance to the people in C. Staples because Eskew told him he was doing so. However, Brown continued to do so until he left the building. Therefore, this conviction would also not be against the manifest weight of the evidence.
Brown's final conviction was for resisting arrest. Williams testified he told Brown Eskew was a police officer and Eskew testified he told Brown he was under arrest, but that Brown kept fighting him. Brown and Crum deny hearing Williams say Eskew was a police officer. Even though Eskew was off duty, he has the continuing obligation to preserve the peace and when acting as a private security policeman had the right and duty to arrest and detain a person who was violating the law of this state. State v. Glover (1976), 52 Ohio App.2d 35, 38, 6 O.O.3d 20,367 N.E.2d 1202. This conviction, therefore, is also not against the manifest weight of the evidence.
In conclusion, when the evidence is looked at as a whole, it attains the high degree of probative force and certainty required of a criminal conviction. The only contradictory testimony is that of the defendant, which would obviously be self-serving, and that of his friend who admitted he was drunk at the time. Brown's conviction was not a manifest miscarriage of justice which would necessitate a new trial. Therefore, Brown's sole assignment of error is meritless and the decision of the trial court is affirmed.
Vukovich, P.J., and Donfrio, J., concur.